24   207
31   608

No. 2480.

## A. A. STEAGALD *v.* THE STATE.

MURDER—EVIDENCE—THE CORPUS DELICTI being the issue under immediate inquiry, the State was permitted to ask its medical witness how, in his opinion, based upon the examination of the body, the injuries thereon were inflicted. The defense objected that the question called for the mere conclusion of the witness as an individual, and not for his opinion as an expert, and that it involved matter upon which the jury were as competent to form an opinion as the witness. The objection was overruled, and the witness was permitted to state his opinion as an individual as to "the only way he could imagine the peculiar injuries were inflicted." *Held,* that the objection should have been sustained, but that, in view of the other evidence in the case, the question and answer prejudiced no right of the accused; wherefore the error was immaterial. See the opinion for an elaboration of the ruling.

APPEAL from the District Court of Cooke. Tried below before the Hon. F. E. Piner.

The indictment in this case, which charged the appellant with the murder of the infant of his daughter, Mollie Steagald, in Clay county, Texas, on the twentieth day of January, 1886, was filed in the district court of Clay county on the sixteenth day of March, 1886, and within a few days thereafter the appellant was placed upon his trial in the district court of the said Clay county.

That trial resulted in the conviction of the appellant in the first degree, the jury assessing the death penalty against him. From that conviction the appellant appealed to this court, which, at its Tyler term, 1886, reversed the judgment because of error committed by the trial court in overruling the motion for new trial, which, among other reasons, was applied for because of the failure of the trial judge under the peculiar circumstances surrounding the case, to order a change of the venue upon his own motion. Upon the reversal of the case, the judge of the district court of Clay county, upon his own motion, ordered the change of venue to Cooke county, in the district court of which, at its spring term, 1887, this trial was had, resulting in the appellant's conviction for murder in the first degree, with a life term in the penitentiary assessed as his punishment.

The report of the proceedings of the first trial of the appellant, comprehending a full statement of the evidence then adduced, will be found in the twenty-second volume of the Reports, commencing on page 464. The evidence presented upon this trial was substantially the same as that adduced upon the former trial, except that, upon this trial, the counsel for the State elicited from one of the medical witnesses a more positively expressed opinion that the wounds found upon the body of the deceased were inflicted before death, proved more directly the predicate upon which the written testimony of the witnesses residing out of the State was admitted, and produced the additional witnesses who testified to the facts set forth in the opinion of the court and in the summary which follows.

Doctor S. G. Bittick, the first witness for the State, testified substantially as he did upon the first trial of the defendant. Referring to his testimony, as it will be found set out in the report of that case (22 Texas Ct. App., 464), it will be seen that he stated that when he first arrived at the house of the defendant, during the labor of his daughter Mollie, and before the birth of the child, he found no one present but defendant and his wife and an old lady whose name he did not know. Reiterating that statement upon this trial, the witness said that he had ascertained the name of the old lady since the former trial, and that it was Mrs. Candler. According to the statement of the witness on this trial, Mrs. Candler was present at the defendant's house when witness arrived, but left the house on the evening of Friday, the day before the child was born, and had not been seen by the witness since. This witness denied that he told defendant

that anything was the matter with Mollie's liver, or that he operated on her liver.

The State introduced Mrs. Candler, who testified, in substance, that she lived in Cambridge, Clay county, Texas, and lived there in January, 1886. She was then but slightly acquainted with the defendant, having seen him but a few times. On the night of January 14, 1886, the defendant came to the witness's house and requested her to go with him to his house to see his wife, who, he said, was very sick. Witness readily consented to go home with defendant and render any service in her power to Mrs. Steagald. En route, and before reaching the house, the defendant said to witness, "You will be more surprised when you go into my house than you ever were in your life." The witness asked him what would so surprise her, and defendant replied, "We are in a heap of trouble." He had previously said to the witness that he had more trouble than any man living; to which the witness replied that "people sometimes borrow their trouble." When the witness entered the defendant's house she found Mrs. Steagald, whom he had reported very sick, up and attending to her household affairs, in apparently perfect health. She, however, found Mollie, the defendant's eldest daughter, sick in bed. The defendant did not tell witness what was the matter with Mollie, but witness soon found out her condition, and told defendant that he had better summon some of the other of his lady neighbors. Defendant replied that he wanted no one else at his house, that the other women talked too much. The witness then told him that he must summon a doctor. Defendant then went off and came back with Doctor Bittick. Doctor Bittick came first to the door, without going in. He then went off and returned after a while with Doctor Galloway. This was on January 15, 1886. Just before Doctor Bittick got back with Doctor Galloway, the witness observed the defendant and his wife alone together in their kitchen, and overheard the defendant tell his wife that when the doctors came she must tell them that Mollie was a girl who had been living with them some time. Mrs. Steagald replied to the defendant: "I won't do it; if you want that told, tell it yourself." Witness remained at the defendant's house until about four o'clock on that evening, when she went home, was taken sick, and did not go back to the defendant's house at all. Shortly after the witness reached the defendant's house, the defendant asked her if she could do anything for Mollie, and said that if she could and would, he

would pay her well. Shortly after that the defendant came from the kitchen into the front room, where the witness then was, and while walking across the floor he said in a loud voice, but speaking to no one in particular: "The scoundrel is gone or I would kill him!" The witness saw no infant's clothing while she was at the defendant's house. Mollie Steagald had never been intimate with, nor had she ever kept the company of any young man. Mrs. Steagald and her family were not living in Cambridge at the time of this trial.

Mrs. McKinsey testified, for the State, that she lived in Cambridge, Clay county, Texas, in January, 1886. She had then known the defendant and all of his family about five years. The defendant's daughter Mollie died in the defendant's house in Cambridge, on or about January 20, 1886. The witness went to the defendant's house on the morning of the Tuesday on which Mollie died, and remained there until Mollie's death in the evening. When she found Mollie sick, she asked the defendant what was the matter with her. He replied that she was suffering from an abcess on the liver, which the doctor had tried to remove. About noon of the same day he corrected that statement, and said that Mollie's affliction was abcess of the womb. The defendant remained near and about Mollie's bed during the whole time witness was at the house. A short time before the girl's death, the witness and other ladies decided to bathe her. The defendant interfered, and insisted on bathing her himself. Witness pushed him back, and told him that so long as she was there attending upon the sick girl, he could not bathe her. Defendant insisted that he was so accustomed to bathing his daughter that he could do it better than any one else. He yielded reluctantly, and the ladies proceeded to bathe the girl, and in doing so the witness discovered the bandages around the girl's abdomen, and for the first time ascertained the true nature of the girl's illness. Just after the death of Mollie, the defendant came into the front room and asked his wife, in witness's presence, what clothes he should get for the dead girl to be buried in. Mrs. Steagald replied: "She needs everything, for she has nothing." In reply, the defendant said to his wife: "Don't fret, Kate; Mollie is better off, for she is in Heaven; we will try to raise our other children better, and we will do better ourselves." Mrs. Steagald replied: "I think it is time; I wish you had thought of that sooner." Defendant then said: "I will never say again that there is no Heaven and no God." He then

left the room, saying to his wife: "Say nothing about this, Kate; just keep it quiet." During all of the time that witness was at defendant's house, she saw nothing of any infant's clothes, nor did she, up to the time of Mollie's death see anything of the child. After the inquest over Mollie's body, some of the men found the body of an infant in the garret of defendant's house. An inquest was then held upon the body of the infant, and it was then given to witness to dress. The body had never been dressed, nor had it been washed except on the face and one side of the head. The right arm was broken between the elbow and the shoulder, and was bloodshot from the wrist to the shoulder, imparting a very dark and almost purple color to the arm. The neck was also broken, and the back part of the skull was crushed in. Witness washed and dressed the child, and gave it to the men, who took it to Henrietta, whence it was afterwards brought back and buried in its mother's arms. Just before Mollie's death, the witness asked her if she thought she could eat anything. She replied that she felt like she would relish a little rice. Witness then proposed to send to a neighbor's house for some rice. This, however, the defendant would not permit her to do, saying that he had sent to town for some. Mollie Steagald had never, during the witnesses's acquaintance with her, received the attention of any young man. She was never in the company of a young man but once that the witness ever heard of, and that was when, about a year before her death, the witness's son escorted her home from church. Mollie generally attended church and parties, but usually in the company of the defendant, and invariably in company with some member of her family.

*R. V. Bell, Yancy Lewis* and *E. P. Hill,* for the appellant: Appellant's first proposition asserts the inadmissibility of Doctor Ferris's testimony as to his opinion as to how the injuries described by him on the body of the infant were inflicted. Under the decisions of the courts of this State, this evidence, it is submitted, is clearly inadmissable. Cooper v. The State, 23 Texas 331, followed and approved in Campbell v. The State, 10 Texas Ct. App., 360, is the leading case in point. In that, a capital case, the court considered at length the present question, and both stated the rule governing this character of testimony and collated its exceptions. "Where the jury are as competent as any other persons to deduce the proper conclusions from a given

state of facts, the opinions even of scientific witnesses are not admissible in evidence, as to the conclusion or inference to be drawn from them." (Cooper's case.)

Touching the exceptions to this rule, Judge Sutherland says: "On questions of science or skill or trade, persons of skill in those particular departments are allowed to give their opinions in evidence; but the rule is confined to cases in which from the very nature of the subject facts disconnected from such opinions can not be so presented to a jury as to enable them to pass upon the question with the requisite knowledge and judgment. Thus a physician may express an opinion that the wound given or poison administered produced the death of the deceased."

There is another class of cases in which the question is not one of science or skill, yet in which non-expert witnesses are permitted to express their opinions. Illustrations of this class occur when witnesses testify to identity; to handwriting; to sanity or insanity; to degree of affection entertained by one person for another. A correct statement of the rule we submit, is: In matters of science or skill, it is proper to prove by expert opinions what amounts, not to a decision of a fact to the exclusion of the jury, but to the establishing of a new fact, relation or connection, which would otherwise remain unproved; and in some matters, not of science or skill, to prove certain facts as of identity, etc., by the opinions of witnesses, resting on a knowledge acquired in a way that can not be communicated, or based on facts that in their very nature are incapable of being explained to others.

Now, in the language of the rule, was Doctor Ferris's opinion acquired by the exercise of peculiar skill, and did it establish some new fact, connection or relation, which otherwise would have remained unproved? He says he did not speak as an expert. Obviously he established no new fact. Did his opinion rest on knowledge acquired in a way that could not be communicated or based on facts incapable in their nature of being explained to others? Clearly not; for he stated the source of his opinion and averred the damning fact that it was derived from examination of the body.

Counsel had endeavored to exclude this testimony in the way known to the law and the practice. They had objected to its admission. To the action of the court overruling their objection they had duly saved exception. Under the circumstances it was not for them to assume that the learned judge would strike out

on request what he had admitted over exception. And had counsel so known they could not, by moving the court to exclude, have righted the effect of this gross error; they could not have effaced from the minds of the jury the picture of this appellant, in murderous fury, crushing with iron heel the infant's skull, wrenching and breaking its arm and dislocating its neck. The jury had received the fact that this was the conclusion reached from the examination of the body by the man called in professional capacity to perform that duty. No instructions of the court could have effaced it. No elaborate presentations by counsel of the law's requirements of proof could efface it. Vain and idle was it to argue to the jury that the corpus delicti was not proved; that the injuries existing, magnified and exaggerated by the startled spectators, were produced by natural causes connected with the birth, or might have been caused by accident occurring in hiding the body. Idle such arguments, with this spectre of Doctor Ferris's imagination before the jury, even though the court had, on motion to exlude, in terms "bid it down." When did it become the law that a witness, not speaking as an expert, could testify to his opinion in a matter about which the jury were as competent to judge as the witness? In admitting this testimony over objections specifically stated and over exceptions duly saved, counsel for appellant, with whatever cogency they can command, insist and urge that the trial court erred in a matter, not irrelevant or immaterial, but of pregnant import to appellant, and that though this record should in other respects be held free from error, for this alone, fatally prejudicial to his rights, the cause must be reversed and remanded.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant stands convicted of the murder of an infant, the child of his daughter; the jury finding him guilty of murder of the first degree and assessing his punishment at confinement in the penitentiary for life.

We have carefully examined this record, both with reference to assigned and unassigned errors, and the examination leads us to the conclusion that it presents but one question which requires discussion.

Upon the trial the State propounded this question to Doctor Ferris: "What is your opinion, from the examination you made

of the body, as to how the injuries you saw, to wit, the arm broken, the neck broken and the skull crushed, was done?" This question was objected to by appellant, because "it called for the opinion of the witness as an individual, and not as an expert; was mere speculation on the part of the witness, and was matter about which the jury were as competent to judge as the witness." The objection being overruled, the witness answered: "I am of opinion that the only way it could have been done, or the only way I can imagine, is that the party put the infant on its face, and placed his boot heel on the back of the head, and caught hold of the right arm and pulled it, and stamped on the back of the head, crushing the skull and breaking the neck and arm." "Witness Ferris also stated that this opinion was not as an expert, but as individual, and the injuries might have been inflicted in many other ways."

The objection should have been sustained upon the grounds urged. Incompetent, however, as it clearly was, did the opinion of the witness, as to the manner in which the injuries were inflicted, operate to the injury of appellant's rights? Do the facts stated in the opinion of the witness tend to establish the corpus delicti. That is to say, that the child met its death, after being born alive, at the hands of some person by violence? They certainly do; but was not this completely and conclusively established by competent evidence, independent of Doctor Ferris's opinion.

Doctor Bittick, who attended at the birth of the child, says: "The child's arm and neck were not broken, and its skull was not crushed, nor were any wounds or bruises on it when it was born, or when I last saw it alive. I stayed half, or perhaps an hour, after the birth of the child, and then left and went home. When I left the child was lying across a small bed at the foot of its mother's bed, still unwashed and undressed, wrapped in a piece of quilt. It was crying occasionally and breathing all right, and I saw nothing whatever the matter with it."

Doctor Barnett says: "I do not think that a new born babe's neck could be broken, head crushed and arm broken, by an accidental fall of any kind. I do not see how it is possible for such a combination of injuries to be produced by accident." To the same effect is the testimony of Doctors Watson, Black and Egan.

For the defense, Doctor Thurmond testified: "If I should see a contusion or discoloration to any great extent on the arm of a

dead body, I would conclude that the injury which inflicted discoloration was given before death."

Doctor Watson, for defendant, says: "If I should find the dead body of a child, with its neck broken, its skull crushed in to the depth of half an inch, its arm broken, discolored and blood shotten, I should conclude that it had come to its death by violence, and not from natural causes." On the same side and to the same effect also testified Doctor Modrall.

It was proven by several witnesses that after a short search they found the dead child hid in the garret of defendant's house; that there was a hole in the ceiling, which was covered with a sack nailed over closely. The body was found in a box, the neck and arm broken and the skull crushed.

Now, we believe that if it be possible to establish any fact conclusively, the fact of the corpus delicti, that is, that the child was born alive and came to its death by violence, this fact is so established in this case. And, conceding that the opinion of Doctor Ferris tended to prove the corpus delicti, since there could not be a rational doubt as to this, the opinion could not have injured appellant's rights.

Did the opinion of Doctor Ferris in any way point out the defendant as being the person who inflicted the injuries? We think not; nor is this effect claimed by counsel who so ably represent the appellant here. But it may be contended that appellant was prejudiced, because the method of the infliction, as exhibited in Doctor Ferris's opinion, presents a degree of inhuman barbarity almost without a parallel in the history of crime. The imagination is not fertile enough to invent a method by which the injuries which were in fact inflicted could be abated of their cruel brutality. Concede that the wounds were inflicted in any other way than as surmised by Doctor Ferris, none could be conjectured which would relieve the killing of its hideous enormity. That the appellant was thus prejudiced is contradicted by the punishment assessed. If he was the perpetrator of this foul deed, there can be no doubt that the crime is murder in the first degree; there is no lower grade in the case. The jury had the right to decree his death, but chose the more merciful punishment. The judgment is affirmed.

*Affirmed.*